# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY
# NORTHERN DIVISION at ASHLAND

Civil Action No. 10-55-HRW

ROBERT L. SALYERS, SR.,
**Administrator of the Estate of**
Robert Salyers, Jr.,                                             **PLAINTIFF,**

v.                    **MEMORANDUM OPINION AND ORDER**

CITY OF PORTSMOUTH, OHIO,
CHARLES H. HORNER, Individually
and in his Official Capacity as
Chief of Police, Portsmouth, Ohio,
DAVID THOROUGHMAN, Individually,
and in his Official Capacity as
Captain and Acting Chief of Police, Portsmouth, Ohio,
J.B. LEACH, Individually
and in his Official Capacity as Sergeant,
Portsmouth Police Department,
JAMES DAVIS, II, Individually,
and in his Official Capacity as Sergeant,
Portsmouth Police Department,
BRUCE BARNEY, Individually
and in his Official Capacity as Lieutenant,
Portsmouth Police Department
ROBERT NICHOLS, Individually
and in his Official Capacity as Officer,
Portsmouth Police Department
TIFFANY UNDERWOOD, Individually
and in her Official Capacity as Officer,
Portsmouth Police Department,                          **DEFENDANTS.**

     This matter is before the Court upon the Motion of the City of Portsmouth,

Ohio, Charles H. Horner, Individually and in his Official Capacity as  Chief of

Police, Portsmouth, Ohio, David Thoroughman, Individually, and in his Official

Capacity as  Captain and Acting Chief of Police, Portsmouth, Ohio, J.B. Leach,

Individually and in his Official Capacity as Sergeant, Portsmouth Police

Department, James Davis, II, Individually, and in his Official Capacity as

Sergeant, Portsmouth Police Department, Bruce Barney, Individually and in his

Official Capacity as Lieutenant,  Portsmouth Police Department, Robert Nichols,

Individually and in his Official Capacity as Officer, Portsmouth Police Department

and Tiffany Underwood, Individually and in her Official Capacity as Officer,

Portsmouth Police Department for Summary Judgment [Docket No. 77] and

Plaintiff's Motion to Amend Complaint [Docket No. 100].

For the reasons stated herein, the Court finds that the Defendants are

entitled to judgment as a matter of law and that leave to amend the Complaint is

not warranted.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This action arises from a pedestrian accident which occurred on the night of

June 10, 2008, on US 23 near the Grant Bridge in Portsmouth, Ohio.  The accident

resulted in the death of Robert Salyers, Jr.

On June 10, 2008, Robert Salyers, Sr., stopped by the residence of his son

Robert Salyers Jr. (hereinafter "Salyers" or "decedent"), as he did every morning,

to give Salyers his daily dose of Methadone.

On the morning of June 10, 2008, Salyers took two Methadone tablets in the

presence of his father who left the residence at approximately 10:30 a.m.

Later that morning, before noon, Salyers involved in a motor vehicle accident in the village of New Boston. He fled from the scene.

Two hours later, Salyers was involved in another motor vehicle accident at the intersection of U.S. Route 23 and 8th Street in the City of Portsmouth, Ohio.

Portsmouth Police Officer Robert Nichols arrived on the scene of the second accident at 2:36 p.m. and recognized Salyers' vehicle as one matching the description of a vehicle which had been involved in the earlier New Boston hit-skip. He contacted the New Boston Police Department.

Officer Nichols questioned Salyers, tested him for intoxication and placed him in the back of his cruiser.

Captain David Thoroughman, the acting Chief of Police of the City of Portsmouth, was on duty that afternoon and driving in the area where the second accident occurred. He stopped at the scene to see if he could provide any assistance to Officer Nichols.

Neither officer detected the odor of alcohol on Salyers or considered him impaired. Officer Nichols testified that Salyers exhibited the ability to speak, walk, and talk and was cooperative throughout their entire interaction. Officer Nichols issued Salyers a citation for failing to obey a traffic control device and released him to Capt. Steve Goins of the New Boston Police Department, who

3

had arrived at the scene.    He talked briefly with Officer Nichols.  Capt. Goins

then approached Officer Nichols' cruiser and asked Salyers to step

out of the cruiser.  He then asked Salyers if he was the driver in the New Boston

hit-skip that occurred earlier in the morning. Salyers admitted that he was. Capt.

Goins returned to his cruiser, wrote out a citation, and gave  it to Salyers.   Capt.

Goins then left the scene.  He testified that he did not believe Salyers was impaired

in any manner.

   At 4:51 p.m., Portsmouth dispatch received a call reporting a white male in

his 40's wearing a Dallas Cowboys jersey and a yellow cap pounding on the

windows of vehicles.   The subject was making an attempt to get into a vehicle

which was stopped at a red light.   Although the general description matched that

of Salyers, when Portsmouth Police Officers arrived at the scene, he was nowhere

to be found.

   At 8:45 p.m. another call was received by dispatch involving a subject doing

damage to a parked vehicle outside the Portsmouth Army Recruiting Center. Sgt.

James Davis II and Officer Tiffany Underwood were dispatched to that scene at

8:52 p.m. Again, the officers checked the area, but could not find a suspect.

   At 8:58 p.m., however, Sgt. Davis saw Salyers on the Grant Bridge.  He

testified that he witnessed walking "on the west road travel portion of the bridge."

 As there are no pedestrian sidewalks on the Grant Bridge, Sgt. Davis pulled in

behind Salyers and turned on his emergency lights.   He exited his cruiser and

approached Salyers. Sgt. Davis explained to Salyers why he was pulled over,

quickly patted Salyers down, placed Salyers in handcuffs and sat him down in the

back of his cruiser.  Salyers was in the cruiser for approximately twenty

minutes. Sgt. Davis testified Salyers was cognizant of where he was and provided

correct answers when asked the day's date, the current President, and where the

United States was at war.   Sgt. Davis concluded SAlyers was not impaired.

    During Sgt. Davis' interaction with Salyers, Officer Underwood had arrived

on the bridge. She testified she pulled in behind Sgt. Davis' cruiser and

approached Davis and Salyers as they were standing outside the cruiser. She saw

that  Salyers was handcuffed and witnessed Sgt. Davis pat down Salyers. She then

left the bridge after being instructed by Sgt. Davis  to find the victim/owner of the

damaged vehicle.  She could not and reported this to Sgt. Davis.

    Sgt. Davis testified that as a result of not having the name of the

victim/owner of the damaged vehicle, he could not charge Salyers with the

misdemeanor of criminal damaging.

    Shortly prior to 9:20 p.m., Lt. J.B. Leach arrived on the Grant Bridge, pulled

up next to Sgt. Davis' cruiser, and asked if Davis could charge Salyers with

anything. Sgt. Davis advised Lt. Leach that he had no basis to charge Salyers with

any criminal conduct and Lt. Leach responded by instructing Sgt. Davis, "[j]ust

don't leave this guy (Salyers) on the bridge."

Sgt. Davis testified he asked Salyers if there was a place such as a restaurant where he could take him but Salyers declined and told him he had called his father and that he was on his way to pick him up on the south side of the bridge.

Sgt. Davis testified that he offered to call Salyers' father in order to make sure he was on his way, but that Salyers, again, declined.

Sgt. Davis then told Salyers that he had to take him off the bridge because of the vehicle traffic.   He walked Salyers to a safe area, where he could wait for his father.   The area to which Sgt. Davis lead Salyers is a grassy area on the other side of the guardrail.  Sgt. Davis testified that he had used this area in the past to pullover semi-tractor trailer trucks.  Sgt. Davis further testified that he specifically told Salyers that he could not walk on the highway and that Salyers assured him that he would not.

Yet, rather than remaining in the area where Sgt. Davis dropped him, Salyers walked into the

eastbound lane of traffic and was struck and killed by a vehicle.

The accident occurred at approximately 9:35 pm.

Robert Salyers, Sr. Filed this lawsuit,  seeks monetary damages from the City of Portsmouth and several of its police officers pursuant to 42 U.S.C. § 1983.  He claims that the City and the individual officers violated his son's rights

6

under the Eight and Fourteenth Amendments to the United States Constitution.

He also alleges negligence and wrongful death pursuant to the state law of Ohio.

## II.    SUMMARY JUDGMENT STANDARD

In 1986, the United States Supreme Court set forth  the standard for

summary judgment in a trilogy of cases: *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242 (1986),  *Celotex v. Cartett*, 477 U.S. 317(1986) and *Matsushita Electric*

*Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  Following this

precedent and Fed.R.Civ.P. 56(c), the moving party is entitled to judgment as a

matter of law when "[t]he pleadings, depositions, answers to interrogatories and

admissions on file, together with affidavits, if any, show that there is no genuine

issue of material fact."   *Celotex v. Cartett*, 477 U.S. at 322-323.

## III.   ANALYSIS OF DEFENDANTS' MOTION FOR SUMMARY
         JUDGMENT

In Plaintiff's Memorandum in Opposition to Defendants' dispositive

motion, he concedes that summary judgement is proper with respect to Defendants

Lt.  Bruce Barney, Chief Charles Horner and Officer Tiffany Underwood.  As

such, the Court will not address the merits of Defendants' motion as it pertains to

these Defendants.

The remaining Defendants claim that they have qualified immunity as to all

claims asserted against them.

**A.    Defendants are entitled to qualified immunity as to the claims asserted against them pursuant to 42 U.S.C. §1983.**

The doctrine of qualified immunity protects government officials  from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Fisher v. Harden*, 398 F.3d 837, 842 (6th Cir.), *cert. denied*, 546 U.S. 1075 (2005).

Whether a police officer is protected by qualified immunity for an alleged unlawful, official action generally turns on the "objective legal reasonableness" of the action assessed in light of the legal rules that were "clearly established" at the time it was taken. *Kostrzewa v. City of Troy*, 247 F.3d 633, 641 (6th Cir. 2001), *citing Harlow v. Fitzgeral*, 457 U.S. 800, 818 (1982).

i.    Sgt. Davis is entitled to qualified immunity.

Of the Defendant officers, Sgt. Davis is the only who had more than passing, incidental contact with Salyers.  Therefore the basis for his immunity will be addressed first.

Plaintiff claims Sgt. Davis violated Salyers' due process and equal protection rights guaranteed under the 14th Amendment as well as Salyers' right to be free from cruel and unusual punishment under 8th Amendment.   Plaintiff asserts those aforementioned constitutional rights were violated when Sgt. Davis took Salyers into "functional" custody and transported him across the Grant

8

Bridge and left him on the side of U.S. Route 23.

The Fourteenth Amendment provides that no person shall be deprived of "life, liberty, or property, without due process of law."   Deprivations of liberty caused by "egregious" official conduct" may violate the Due Process Clause. *Meals v. City of Memphis, Tennessee*, 493 F.3d 720, 730 (6th Cir. 2007).   However, in order to maintain a claim for a violation of substantive due process, a plaintiff must establish that the conduct "shocks the conscience."

In this case, there is no evidence that any actions taken by Sgt. Davis was done with any intent to injure Salyers.  The record is devoid of conduct which would shock one's conscience to constitutional dimensions.

Moreover, Salyers was not even directly injured by Davis, or any other Portsmouth police officers; instead, he was struck and killed by a third party motorist.

In an effort to keep his claim with the purview of Section 1983, Plaintiff argues that Sgt. Davis owed his son an affirmative duty of protection, which he breached.   The Court disagrees.

As a general rule, there is no constitutional guarantee of protection against private violence. *See Deshaney v. Winnebago County Department*, 489 U.S. 189 (1989).     There are, as Plaintiff points out, limited exceptions.  The exceptions exist "where a person suffered injuries while in state custody" or where the actions

9

of the state "made him more vulnerable to private violence." *Id.* at 196.

Despite Plaintiff's contention to the contrary, he cannot establish either that the decedent was in the custody of the Portsmouth police when he was struck by motorist  or  that Portsmouth officers placed decedent in a situation which made him more vulnerable to being struck and killed by an automobile. Thus, Plaintiff cannot establish that any due process violation under § 1983 occurred.

*Cartwright v. City of Marine City* is a Sixth Circuit case directly on point to the case at bar 336 F.3d 487 (6th 2003). In *Cartwright*, Dinnell Cartwright's estate sued the City of Marine City alleging that officers failed to prevent his death, in circumstances almost identical to those in the case at bar.   Around midnight, two City of Marine police officers were en route to a convenience store for a prisoner pickup when they saw Cartwright on the side of the road and stopped to ask him where he was going. The officers offered Cartwright a ride which he accepted and drove for approximately ten minutes until they reached the convenience store. During the trip, the officers asked Cartwright for his identification card which he produced. Both officers also testified they each noticed Cartwright smelled of alcohol, but did not exhibit any other signs of intoxication such as bloodshot eyes or slurred speech. At the convenience store, the officers took custody of their prisoner and told Cartwright that they could not put him in the back of the cruiser with the prisoner and transport him any further unless Cartwright

10

consented to a patdown search. Cartwright refused the pat-down search and told

officers that he did not want a ride. As a result, the officers left Cartwright at the

store and drove away. A few hours later, Cartwright was run over by a truck and

killed in the middle of the road about two miles away from the convenience store.

*Id.* at 487.

The United States Sixth Circuit Court of Appeals held that both City of

Marine City police officers were entitled to qualified immunity. In doing so, the

Sixth Circuit recognized that the outcome would have been different had the

officers created a situation in which the decedent had been in danger or had the

decedent been in custody.

Likewise, in this case, Salyers was not in custody. In *Cartwright*, the Sixth

Circuit defined custody as the "intentional application of physical force and a

show of authority made with the intent of acquiring physical control." *Id.* at 491

(internal citations omitted). Salyers was not charged and, per his own request,

was dropped of at the south portion of the bridge and released into a safe area next

to Rt. 23. Asking for a ride does not create a custodial relationship.

Nor did Sgt. Davis increase Salyers' vulnerability to private violence.

Dropping off Salyers at a place where there was a grassy area on the side of the

road which was separated from the road by a guardrail is a far less dangerous than

the place from where Salyers was removed, which was walking next to the travel

11

lane in the roadway on a bridge without sidewalks for pedestrians.  By no means could a reasonable jury find that Sgt. Davis' transport of Salyers to the grassy area next  to U.S. Route 23 was to a place more dangerous than where he originally encountered Salyers.   Indeed, Sgt. Davis placed Salyers *out of harm's way.*

As in *Cartwright*, there is no indication that either exception applies.

As for the Eight Amendment, because Salyers was not incarcerated or convicted at the relevant time, it is simply not applicable to this case.

ii.     The remaining Officers are entitled to qualified immunity.

The same analysis applies to Capt. Thoroughman, Lt. Leach and Officer Nichols, who had only incidental contact with Salyers.  None of these officers had Salyers in custody or increased his vulnerability to private harm.  Therefore, they are entitled to immunity.

iii.     There is no basis of liability against the City of Portsmouth.

It is well established that there is no liability under Section 1983 against municipalities for the action of its police officers. *See generally, Monell v. Dept. of Social Services*, 436 U.S. 658 (1978).  A municipality's liability exists "where execution of a government's policy or custom...inflicts the injury." *Id.* at 694.  However, a city's customs or procedures, standing alone, do not give rise to liability. In order to prevail on what is referred to as a *Monell*-claim, it must be

12

demonstrated that one of the individual officers inflicted a constitutional injury.

*Id.*

As discussed *supra*, Plaintiff cannot establish a constitutional violation at the hands of the individual Defendants. Therefore, the City of Portsmouth is not subject to liability.

### B.   Defendants are entitled to qualified immunity as to the claims asserted against them pursuant to Ohio law.

Statutory immunity applies to the individual Defendants.

O.R.C.§2744.03(A)(b)(6) provides immunity unless the individual officers acted, or failed to act, "with malicious purpose, in bad faith or in a wanton or reckless manner." Ohio Courts have described "wanton" as "exhibiting a complete lack of care." *Foos v. City of Delaware*, 2012 WL 2896901, *10 (6th Cir. 2012). Mere negligence is not enough. *Id.*

Plaintiff has not brought any evidence to the Court's attention which would render O.R.C.§2744.03(A)(b)(6) inapplicable. As discussed *supra*, Sgt. Davis endeavored to position Salyers out of harm's way.

As for the City of Portsmouth, it, too, enjoys broad blanket of immunity, with only five exception, as enumerated by statute:

> (1) Except as otherwise provided in this division,
> political subdivisions are liable for injury, death, or loss
> to person or property caused by the negligent operation
> of any motor vehicle by their employees when the

employees are engaged within the scope of their employment and authority.

(2) Except as otherwise provided in sections 3314.07 and 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions of the political subdivisions.

(3) Except as otherwise provided in section 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property caused by their negligent failure to keep public roads in repair and other negligent failure to remove obstructions from public roads, except that it is a full defense to that liability, when a bridge within a municipal corporation is involved, that the municipal corporation does not have the responsibility for maintaining or inspecting the bridge.

(4) Except as otherwise provided in section 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property that is caused by the negligence of their employees and that occurs within or on the grounds of, and is due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental function, including, but not limited to, office buildings and courthouses, but not including jails, places of juvenile detention, workhouses, or any other detention facility, as defined in section 2921.01 of the Revised Code.

(5) In addition to the circumstances described in divisions (B)(1) to (4) of this section, a political subdivision is liable for injury, death, or loss to person or property when civil liability is expressly imposed upon the political subdivision by a section of the Revised

Code, including, but not limited to, sections 2743.02 and
5591.37 of the Revised Code. Civil liability shall not be
construed to exist under another section of the Revised
Code merely because that section imposes a
responsibility or mandatory duty upon a political
subdivision, because that section provides for a criminal
penalty, because of a general authorization in that section
that a political subdivision may sue and be sued, or
because that section uses the term "shall" in a provision
pertaining to a political subdivision.

O.R.C. §2744.02(B)

Salyers was struck by a vehicle driven by a private individual. This factual

scenario does not match these exceptions.

## IV.   PLAINTIFF'S MOTION TO AMEND COMPLAINT

A year and a half after he instigated this civil action, at the Pretrial

Conference, Plaintiff made an oral motion to Amend his Complaint to allege

negligence under Kentucky law. The Court permitted the parties to file briefs in

this regard [Docket Nos. 104 and 105].

Federal Rule of Civil Procedure 15(a) states that leave to amend a pleading

shall be "freely given when justice so requires." Several elements must be

considered in determining whether to permit an amendment: (1) undue delay in

filing; (2) lack of notice to the opposing party; (3) bad faith by the moving party;

(4) repeated failure to cure deficiencies by previous amendments; (5) undue

prejudice to the opposing party; and (6) futility of amendment. *Coe v. Bell*, 161

F.3d 320, 3410342 (6th Cir. 1998).   This Court is mindful that Rule 16(b) which

requires a district court to enter a scheduling order limiting the time to amend

pleadings and provides that such order shall not be modified "except upon a

showing of good cause," is the first step in the inquiry. Once the deadline for

amendment of pleadings set out in a court's scheduling order passes, a plaintiff

must first show good cause for failure earlier to seek leave to amend before a court

will consider whether amendment is proper under Rule 15(a). *See Leary v.

Daeschner*, 349 F.3d 888, 909 (6th Cir. 2003).

In support of his motion, Plaintiff states that an issue of fact exists Sgt.

Davis' contact with Salyers, specifically, whether such contact was made in Ohio

or Kentucky. He urges that if Kentucky was the location, then he is entitled to

assert a claim under Kentucky law.

The facts to which Plaintiff points in support of the motion were available to

him prior to the deadline for seeking to amend his pleadings. Indeed, his motion

came ten months after such deadline, after the close of discovery and at the close

of the Pretrial Conference. Plaintiff offers no explanation as to why he tarried and

has, thus, not made an adequate showing of "good cause". The Court will not

indulge what appear to be eleventh hour machinations.

## V. CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that the City of Portsmouth,

Ohio, Charles H. Horner, Individually and in his Official Capacity as Chief of

16

Police, Portsmouth, Ohio, David Thoroughman, Individually, and in his Official

Capacity as  Captain and Acting Chief of Police, Portsmouth, Ohio, J.B. Leach,

Individually and in his Official Capacity as Sergeant, Portsmouth Police

Department, James Davis, II, Individually, and in his Official Capacity as

Sergeant, Portsmouth Police Department, Bruce Barney, Individually and in his

Official Capacity as Lieutenant,  Portsmouth Police Department, Robert Nichols,

Individually and in his Official Capacity as Officer, Portsmouth Police Department

and Tiffany Underwood, Individually and in her Official Capacity as Officer,

Portsmouth Police Department's Motion for Summary Judgment [Docket No. 77]

be **SUSTAINED**  and Plaintiff's Motion to Amend Complaint [Docket No. 100]

be **OVERRULED**.

This 12th day of September, 2012.



Signed By:
Henry R. Wilhoit, Jr.
United States District Judge